IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TYRA COLEMAN et al., | : | CIVIL ACTION |
| | : | NO. 05-4506 |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| BLOCKBUSTER, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                    JUNE 30, 2008

Plaintiffs, all former employees of Blockbuster, Inc. ("Blockbuster"), brought this lawsuit alleging that their employment was illegally terminated as a result of racial discrimination, in violation of Title VII and 42 U.S.C. § 1981. Blockbuster moves for summary judgment on the ground, first, that plaintiffs Blackwell-Murray, Blanchard, Garner, Love-Cash, Oliphant, and West have failed to exhaust their administrative remedies as to their Title VII claims. As to the remaining claims, Blockbuster argues that there are no genuine issues of material fact and Blockbuster is entitled to judgment as a matter of law. Blockbuster's motion for summary judgment will be granted, except as to Plaintiff Blanchard's claim of discriminatory termination.

-1-

I.    BACKGROUND

    A.    <u>Store Management</u>

        Defendant Blockbuster, Inc. is a video-rental company with stores throughout the Philadelphia area.  Blockbuster's stores are organized into districts, each of which is overseen by a district leader ("DL").  Urbanek Decl. ¶¶ 4-5 (doc. no. 99).  Each DL is responsible for overseeing the overall financial performance of the stores in his or her district.  <u>Id.</u>  Each store is managed by a store manager who reports directly to the DL.  <u>Id.</u>  Each store also has an assistant store manager, who reports to the store manager, and either a second assistant store manager or a shift leader, who also reports to the store manager.  <u>Id.</u>  Finally, most stores' staffs also include several customer service representatives ("CSRs"); these employees generally work part-time and they do not have management responsibilities.  <u>Id.</u> ¶ 7.

        Store managers, assistant store managers, and shift leaders are known as "keyholders" because they have keys needed to open and close their stores.  <u>Id.</u> ¶¶ 4-5.  While on duty, keyholders are responsible for the store's products, customers, and staff.  <u>Id.</u>

    B.    <u>Employee Training</u>

        Blockbuster trains its employees differently for

different positions. CSRs are trained to work in public areas of the store and their training focuses on customer service. Id. ¶ 10. Assistant store manager trainees receive eight weeks of training that includes an increased focus on "back office" tasks involving paperwork and Blockbuster management processes. Id. ¶¶ 9-10. Store manager trainees receive twelve weeks of training. Id. ¶ 8. All store manager trainees must complete the training program, which includes making a successful oral presentation before a panel, before they are promoted from trainee to manager. Id. ¶ 8.

C.  SWAT Program

Blockbuster maintains a theft-prevention program known as Shrink War Against Theft, or SWAT, to protect its merchandise from theft. Urbanek Decl. ¶ 30-31. When a store's inventory losses reach a specified level, Blockbuster's loss prevention department initiates a SWAT investigation to identify and prevent theft. Id. ¶ 31. In the course of the investigation, Blockbuster requests supplemental information about all store employees' criminal histories. Id. The background check conducted during the SWAT investigation is broader than the background check Blockbuster conducts when initially hiring an employee. Id.

D.    <u>Employee Discipline Policy</u>

Blockbuster maintains a progressive discipline policy, referred to by the company as the Progressive Corrective Action Policy, that governs Blockbuster's responses to employee misconduct.  Employee Handbook 17, Ex. 1, Def.'s Mot. Summ. J. The policy provides for a progressively stronger reaction to violations of Blockbuster's employment policies: first, a verbal warning; second, a written warning; third, a final warning; and fourth, termination of employment.  <u>Id.</u>  However, under certain circumstances discipline might be accelerated, even to the extent that certain violations could lead to immediate termination.  <u>Id.</u>

The Blockbuster Employee Handbook groups violations of Blockbuster policy into three classes: A (most serious); B (serious); and C (less serious).  <u>Id.</u>  According to the Handbook, Class A violations "may be grounds for immediate termination." <u>Id.</u> at 18.  Class A violations listed in the Handbook include "[g]ross negligence that endangers people or property," "falsification . . . of . . . Employee Applications for Employment," or "refusal to cooperate in an investigation."  <u>Id.</u> "Leaving a Blockbuster store unattended by a keyholder is considered gross negligence . . . and is grounds for immediate termination."  Urbanek Decl. ¶ 12.

"After the first occurrence of a [Class B] violation, the employee may receive a written warning and be advised that a

−4−

recurrence may be grounds for termination." Employee Handbook 21, Ex. 1, Def.'s Mot. Summ. J. Class B violations include "[o]pening store late and/or closing store early without District Leader's permission." Id. A Class C violation provides grounds for a verbal warning, which may be documented and placed in the employee's personnel file. Id. at 22.

II.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

        Before filing a civil action asserting a claim of employment discrimination under Title VII, a plaintiff must file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and must exhaust his or her administrative remedies. 42 U.S.C. § 2000e-5; Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984). Plaintiffs Blackwell-Murray, Blanchard, Garner, Love-Cash, Oliphant, and West concede that they did not file individual charges with the EEOC; however, they argue that under the "single filing rule," they may "piggyback" off the charge filed by Plaintiff Terry. Pls.' Mem. Opp. Summ. J. 45. In essence, they argue that Terry's charge met Title VII's exhaustion requirement for all plaintiffs in this case.[1]

---

        [1]    At oral argument, plaintiffs' counsel conceded that, under current Third Circuit law, Terry's EEOC charge does not meet the exhaustion requirement for the other plaintiffs. Plaintiffs are arguing that the single filing rule should be extended to encompass plaintiffs' situation; they do not claim that the rule applies to them in its current form. The Court declines to extend the single filing rule beyond the limitations

"The single filing (or "piggybacking") rule is a judge-made exception to the requirement that plaintiffs exhaust their administrative remedies prior to filing suit." Ruehl v. Viacom, Inc., 500 F.3d 375, 385 (3d Cir. 2007). "'Under the single filing rule doctrine, a plaintiff who has not filed an EEOC charge within the requisite time period can join a class action without satisfying either requirement--exhaustion and filing--if the original EEOC charge filed by the plaintiff who subsequently filed a class action had alleged class based discrimination in the EEOC charge.'" Id. at 386 (quoting Whalen v. W.R. Grace & Co., 56 F.3d 504, 506 (3d Cir. 1995)).

As recently as 2007, the Third Circuit has emphasized the "limited application of the single filing rule to the collective and class action context." Id.; id. 379 nn.4 & 5 (limiting the holding of the case to class actions certified under Federal Rule of Civil Procedure 23 or pursuant to procedures for collective actions set forth in the Fair Labor Standards Act, 29 U.S.C. § 216(b), and incorporated into the Age Discrimination in Employment Act, 29 U.S.C. § 626(b)). In Whalen v. W.R. Grace & Co., the Court of Appeals rejected the extension of the single filing rule beyond the class action context to cases involving the permissive joinder of plaintiffs under Rule

---

articulated by the Third Circuit.

20.[2]  56 F.3d 504, 506-07 (3d Cir. 1995).  "[T]he single filing
rule is limited to plaintiffs who have undergone the class
certification process, because that process ensures notice and
possible conciliation of each class member's claims."[3]  Ruehl,
500 F.3d at 387.

Plaintiffs here have been joined permissively under
Rule 20(a).  The case was not filed as a class action, let alone
certified as one.  Therefore, plaintiffs do not qualify for
treatment under the single filing rule as it has been limited by
the Third Circuit.  Because they have failed to exhaust their
administrative remedies, the Title VII claims of Plaintiffs
Blackwell-Murray, Blanchard, Garner, Love-Cash, Oliphant, and
West will be dismissed.

---

[2]  Federal Rule of Civil Procedure 20 provides that
"[p]ersons may join in one action as plaintiffs if . . . any
question of law or fact common to all plaintiffs will arise in
the action."  Fed. R. Civ. P. 20(a).

[3]  Plaintiffs assert that the EEOC charge filed by
Plaintiff Mark Terry contained allegations broad enough to put
the EEOC on notice that class issues were alleged.  Pls.' Mem.
Opp. Summ. J. 47.  For example, Terry's charge alleged that
Blockbuster had "discharged at least 10-12 black employees," and
that Terry believed that black employees were being treated
differently than white employees.  Id.  Even if Terry alleged
that discrimination was taking place on a class-wide basis,
plaintiffs have not fulfilled the requirement that the resulting
civil suit be certified as a class action.  The Third Circuit has
explicitly rejected the "suggestion that filing a charge with
allegations broad enough to support a subsequent class action
lawsuit alleviates the burden of filing the class action itself,
with the attendant requirement of class certification."  Ruehl,
500 F.3d at 387.

II.  MOTION FOR SUMMARY JUDGMENT

Blockbuster moves for summary judgment on all claims. Because the Title VII claims of Plaintiffs Blackwell-Murray, Blanchard, Garner, Love-Cash, Oliphant, and West are dismissed for failure to exhaust, the Court considers the summary judgment motion as to the following remaining claims: Blackwell-Murray's § 1981 claim for discriminatory termination; Blanchard's § 1981 claims of discriminatory promotion and termination; Coleman's Title VII and § 1981 claims for discriminatory training and termination; Garner's § 1981 claim for discriminatory termination; Love-Cash's § 1981 claims for discriminatory promotion and termination; Oliphant's § 1981 claims for discriminatory training and termination; Terry's Title VII and § 1981 claims for discriminatory termination; and West's § 1981 claims for discriminatory promotion and termination.  Each plaintiff's case is analyzed individually below.[4]

---

[4]     Although plaintiffs joined their claims in a single complaint, each individual plaintiff's case must be considered separately.  The Court initially allowed the joinder of the claims because the Complaint alleged a pattern and practice of discrimination based on a Blockbuster policy of segregating its store and on Urbanek's alleged role in each plaintiff's case. Hr'g Tr. 24:20-25:21, Dec. 20, 2005 (doc. no. 56).  However, plaintiffs have failed to show that their claims stem from a single policy or practice of discrimination.  Although plaintiffs make numerous references to Blockbuster's "African-American" stores, they have failed to show that Blockbuster had any racially discriminatory policies regarding employment and staffing decisions.  Blockbuster admits that it did have a marketing program that tailored advertising and movie offerings to the demographics of customers near Blockbuster stores.

A.    <u>Summary Judgment Standard</u>

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is "material" if its existence or non-existence would affect the outcome of the suit under governing law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact.  <u>Id.</u> at 248-49.  "In considering the evidence, the court should draw all reasonable inferences against the moving party." <u>El v. Se. Pa. Transp. Auth.</u>, 479 F.3d 232, 238 (3d Cir. 2007).

"Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case' when the

_____

However, plaintiffs have failed to show any link between this marketing program and Blockbuster employment practices, much less to the individual adverse employment actions complained of by plaintiffs.

The terminations and other adverse actions complained of by plaintiffs are separate events, involving different factual and legal questions.  Therefore, each claim will be analyzed individually.

nonmoving party bears the ultimate burden of proof." <u>Conoshenti</u> <u>v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 140 (3d Cir. 2004) (quoting <u>Singletary v. Pa. Dep't of Corr.</u>, 266 F.3d 186, 192 n.2 (3d Cir. 2001)).  Once the moving party has thus discharged its burden, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in [Rule 56]--set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

   B.   <u>Disparate Treatment</u>[5]

        The plaintiffs assert claims related to a variety of employment situations--termination, promotion, or training.  The claims will be analyzed under the same legal framework because

---

        [5]   Plaintiffs' brief makes reference at various points to the disparate impact of Blockbuster policies and to the hostile work environment at Blockbuster.  However, plaintiffs' complaint did not assert claims under either a disparate impact or hostile work environment theory; rather, the complaint focused squarely on the disparate treatment allegedly suffered by each plaintiff during his or her employment.  Moreover, the argument section of plaintiffs' brief similarly asserts only a disparate treatment theory.  Plaintiffs do not identify any specific Blockbuster policy that, although facially race neutral, had a disparate impact on African-American employees, nor do they argue that the various incidents of discrimination alleged add up to a hostile work environment.  Rather, they focus on examples of hostility to show that any legitimate reason offered by Blockbuster for plaintiffs' termination is a pretext.  <u>See</u> <u>Aman v. Cort Furniture</u> <u>Rental Corp.</u>, 85 F.3d 1074, 1080 (3d Cir. 1996) (holding that evidence of a hostile work environment may support claim that a proffered reason for termination is pretextual).

each claim asserts that a plaintiff was subjected to an adverse employment action on the basis of race. Thus, each plaintiff asserts a claim for unlawful disparate treatment. The claims will be analyzed identically regardless of whether the plaintiff relies on § 1981 alone or on § 1981 and Title VII. See Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 499 (3d Cir. 1999) ("the elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim").

Claims of disparate treatment that are not supported by direct evidence are subject to the burden-shifting analysis set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this analysis, although the burden of production shifts between plaintiff and defendant, the burden of persuasion remains on plaintiff the entire time. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 799 n.10 (3d Cir. 2003); Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1065 (3d Cir. 1996).

First, a plaintiff must establish a prima facie case of discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); McDonnell Douglas, 411 U.S. at 802. In other words, a plaintiff must show 1) that he or she belongs to a racial minority; 2) that he or she was qualified for the position in question; 3) that he or she was discharged; and 4) that he or she was terminated under circumstances that give rise to an inference

of unlawful discrimination.[6] <u>Waldron v. SL Indus., Inc.</u>, 56 F.3d 491, 494 (3d Cir. 2005) (citing <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)).

The "central focus" of the prima facie case "is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." <u>Sarullo</u>, 352 F.3d at 798.  Although plaintiff need not

---

[6]    At times, the Court of Appeals for the Third Circuit has suggested that the only acceptable method of establishing the fourth element is to show that persons outside the protected class received more favorable treatment than the plaintiff, for example, by showing plaintiff was replaced by a non-minority. <u>See, e.g.,</u> <u>Josey v. John R. Hollingworth Corp.</u>, 996 F.2d 632, 638 (3d Cir. 1993).  However, as recently as April of this year, the Third Circuit has used the broader language--"circumstances that give rise to an inference of unlawful discrimination"--in its definition of a prima facie case under Title VII.  <u>Wooler v. Citizens Bank</u>, No. 07-1035, 2008 WL 877168, at *2 (3d Cir. Apr. 2, 2008).
        Moreover, in a slightly different factual context, the Third Circuit has rejected the notion that the only way of making a prima facie case is to show that plaintiff was replaced by someone outside the protected class.  In <u>Sarullo v. United States Postal Service</u>, defendant argued that plaintiff could only establish a prima facie case for discriminatory hiring under Title VII if he showed that, after defendant declined to hire plaintiff, defendant hired a person from outside the protected class.  352 F.3d at 797 n.7.  The Court of Appeals emphasized that "the prima facie test remains flexible and must be tailored to fit the specific context in which it is applied."  <u>Id.</u> at 798. It went on to hold that plaintiff need only show that defendant held the position open and continued to advertise for an applicant with qualifications similar to plaintiff's.  <u>Id.</u> at 797 n7.  In light of <u>Sarullo</u> and <u>Wooler</u>, the Court adopts the definition of the prima facie case that allows plaintiff to satisfy the fourth element by showing circumstances that give rise to an inference of unlawful discrimination, either by showing more favorable treatment to a specific non-minority employee or otherwise.

show a "precise kind of disparate treatment" by comparing him or
herself to a similarly situated individual from outside
plaintiff's protected class, plaintiff "must establish some
causal nexus between his membership in a protected class" and the
adverse employment decision complaint of.  Id.  A plaintiff's
subjective belief that race played a role in an employment
decision is not, alone, sufficient to establish an inference of
discrimination.  Jones v. City of Philadelphia, 214 F.3d 402, 407
(3d Cir. 2000).

      Establishing a prima facie case will create the
presumption of unlawful discrimination.  St. Mary's, 509 U.S. at
506.  "The burden [then] shifts to the defendant 'to articulate
some legitimate, non-discriminatory reason for the employee's
rejection.'"  Id.  The employer may satisfy this burden "by
introducing evidence which, taken as true, would permit the
conclusion that there was a nondiscriminatory reason for the
unfavorable employment decision."  Fuentes, 32 F.3d at 763.
Finally, "if defendant meets its burden, plaintiff must be given
the opportunity to prove by a preponderance of the evidence that
the legitimate reasons proffered by defendant were not its true
reasons, but rather, a pretext for discrimination."  Id.

      "The plaintiff may show pretext directly by persuading
the court that a discriminatory reason more likely motivated the
employer."  Id.  "The employee can also show pretext indirectly

-13-

by demonstrating that the defendant's proffered explanation is unworthy of credence." Id.  However, "[p]laintiff cannot prevail under Title VII merely by establishing that the employer made a decision that was wrong or mistaken." Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997).  Moreover, a finding that the reason offered by defendant is pretextual "permits," but does not "compel," a finding of unlawful discrimination. Sheridan, 100 F.3d at 1066.

     C.    Analysis of Individal Claims

       The parties agree for purposes of this motion that each plaintiff belongs to a protected class and was qualified for his or her position.  Blockbuster argues that the plaintiffs' claims should fail because each plaintiff is either unable to establish the remaining elements of a prima facie case or unable to show that Blockbuster's legitimate reason for the adverse employment action in question is pretextual.  The claims of the plaintiffs are analyzed individually below.

     1.   Christian Blackwell-Murray

       Blackwell-Murray asserts claims for discriminatory termination under Title VII and § 1981.  It is undisputed that he failed to exhaust his administrative remedies.  Therefore, his Title VII claim will be dismissed.  The Court concludes that,

although Blackwell-Murray established a prima facie case of
discrimination, he fails to point to evidence from which a jury
could conclude that Blockbuster's proffered legitimate reason for
his termination was pretextual.  Therefore, the motion for
summary judgment will be granted as to Blackwell-Murray's claim
under § 1981.


a.  Facts

        Blackwell-Murray was hired by Raymond Pietak as an
assistant store manager for the Wyncote store on October 22,
2003.  Ex. 16, Def.'s Mot. Summ. J.  At the time of Blackwell-
Murray's employment, Brian Joseph was the Blockbuster District
Leader of the district containing the Wyncote store.  Joseph
Decl. ¶ 5.  A SWAT investigation conducted at the Wyncote store
revealed that Blackwell-Murray had falsified his time sheets,
which were used to record the hours during which he worked, in
order to disguise the fact that he had been arriving late to
work.[7]  Joseph Decl. ¶¶ 11-12.

---

        [7]    Plaintiffs' brief focuses on whether Urbanek was
involved with the decision to terminate Blackwell-Murray.  In her
declaration, which was signed on July 11, 2007, Urbanek stated
that she had "never heard the name Christian Blackwell-Murray.
That individual did not work in [her] district during the time
[she] was a DL."  Urbanek Decl. ¶ 26.  Later, at her deposition
on December 7, 2007, Urbanek testified that, at some point,
Joseph had come to her in connection with an investigation of
time cards at one of the stores in his district.  "He was looking
into something with time cards."  Urbanek Dep. 278:3.  Urbanek
testified that she did not assist Joseph with the specifics of

According to Joesph, Blackwell-Murray admitted he had
falsified time records.  Id. ¶ 11; Blackwell-Murray Separation
Form, Ex. 15, Def.'s Mot. Summ. J.  Blackwell-Murray contests
this assertion.  At his deposition, he testified that, during his
termination meeting, he told Joseph that he had never falsified
records and that he believed his termination to be
discriminatory.  Blackwell-Murray Dep. 221:14-24.  Blackwell-
Murray's employment was terminated by Joseph on July 19, 2004.
Ex. 15, Def.'s Mot. Summ. J.

Blackwell-Murray testified that, during his employment,
Joseph checked on him by following him around the store or by
calling the store to ascertain whether he had come to work on
time or not.  Blackwell-Murray Dep. 52, 69.  When Joseph called
to check on Blackwell-Murray, Blackwell-Murray then called a
white Blockbuster manager named Charles to find out whether
Joseph had checked on Charles as well.  Id. at 53:18-19.
Blackwell-Murray testified that Joseph did not call Charles on
the same days that he called Blackwell-Murray; however, he did
not know whether Joseph called Charles on other days or what

---

the investigation or decision-making, but that she referred him
to personnel in Blockbuster's human resources and loss prevention
departments who would be able to assist with the investigation.
Urbanek Dep. 278:3-10, 281:1-10.  Urbanek did not recall whether
she knew at the time that the investigation involved Blackwell-
Murray.  Urbanek Dep. 281:11-16.  In any event, the statement in
Urbanek's declaration that she has never heard of Blackwell-
Murray will be disregarded as inconsistent with her deposition
testimony.

Joseph's practices regarding other stores were.  Id. at 53-57.

        b.   Termination claim

        Summary judgment will be granted as to Blackwell-Murray's claim for discriminatory termination because Blackwell-Murray has not established a prima facie case of discrimination. It is undisputed that he can establish the first three elements of the prima facie case.  However, Blackwell-Murray has not established the fourth prong of the prima facie case.

        He attempts to establish the fourth prong by identifying a white comparator who was treated more favorably than he was.  Blackwell-Murray testified that DL Brian Joseph followed him while he was working to observe whether Blackwell-Murray was stealing and also called the store to find out whether Blackwell-Murray came to work on time.  He claims that Joseph did not scrutinize a white employee named Charles as closely. However, the only evidence that he has of the differing treatment of himself and Charles is hearsay testimony about statements made to him by Charles during conversations about Joseph.  This hearsay is inadmissible, and thus cannot be considered for the purposes of summary judgment.  Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3d Cir. 1996) (holding that inadmissible hearsay cannot be relied upon at summary judgment stage).

        Because comparison with Charles was Blackwell-Murray's

-17-

only evidence as to the fourth prong of the prima facie case and
the evidence of the comparison is inadmissible, Blackwell-Murray
cannot establish the fourth prong.  Blackwell-Murray has failed
to make out a prima facie case of discrimination; therefore,
Blockbuster's motion for summary judgment will be granted as to
Blackwell-Murray's § 1981 claim of discriminatory termination.

2.  <u>Thelma Blanchard</u>

Blanchard asserts claims of discriminatory promotion
and termination under Title VII and § 1981.  It is undisputed
that Blanchard failed to exhaust her administrative remedies.
Therefore, her claims under Title VII will be dismissed.  Summary
judgment will be granted as to Blanchard's claim for
discriminatory promotion because Blanchard has failed to
establish a prima facie case as to that claim.  Summary judgment
will be denied as to Blanchard's claim of discriminatory
termination because there is a genuine issue of material fact as
to whether Blanchard was terminated and, if she was, whether she
was terminated for discriminatory reasons.

a.  <u>Facts</u>

Blanchard was hired as a community service
representative at the Chestnut Hill store on September 25, 2001.
Ex. 27, Def.'s Mot. Summ. J.  In April 2004, Blanchard applied

for employment with Eckerd Drug Stores.  Ex. 28, Defs.' Mot.
Summ.  On her Eckerd application, signed by Blanchard on April
20, 2004, and stamped "Received" by Eckerd on April 26, 2004, she
stated that she was still employed by Blockbuster.  Id.
Blanchard testified that she started working for Eckerd at the
end of April.  Blanchard Dep. 28:17-23.  Blanchard's Separation
Form from Blockbuster is dated May 1, 2004.  Ex. 27, Defs.' Mot.
Summ. J.  Blockbuster claims that Blanchard's employment was
terminated because Blanchard stopped coming to work.

On the other hand, Blanchard claims that she was fired
by Urbanek during a meeting of Blanchard, Urbanek, and Jeff
Stebbins, from the Blockbuster loss prevention department.
Blanchard Dep. 18:6-10, 19-20; id. at 19:2-3.  Urbanek questioned
Blanchard about the use of Blanchard's Blockbuster account and
Blanchard told Urbanek that she allowed other people to rent
movies using her own Blockbuster account.  Id. at 17:12-23.
Shortly after this admission, Urbanek told Blanchard that
Blanchard was terminated.  Id. at 18:21-19:3.  According to
Blanchard, Christina Trunk, a white Blockbuster employee, was not
fired for doing the same after Blanchard informed the store
manager, who in turn informed Urbanek, that Trunk allowed a
friend to use her account.  Id. at 188:22-189:24.  Blanchard
admitted she has no knowledge as to whether an investigation of
Trunk was conducted.  Id. at 189:22-24.

Blanchard testified at her deposition that Trunk received preferential treatment with regard to the work schedule, whereas Blanchard did not. Id. at 128:5-12. Specifically, Blanchard claims that Trunk was not required to work at night. Id. Blanchard also testified that Trunk suffers from night blindness. Blanchard Dep. 128:13-16. Third, Blanchard testified that her pay was reduced once when she was three hours late for a shift, but that Trunk's pay was not reduced when Trunk was late for a shift. Id. at 121:11-17.

In support of her claim for discriminatory promotion, Blanchard testified that, when interviewed about her employment application, she told Abbie (last name unknown) that she would work hard to earn a managerial position. Id. at 180:22-181:3. Furthermore, at some point during her employment, she "complained" to Sheila Love-Cash that she wanted to be promoted. Id. at 182:7-12. Blanchard testified that Love-Cash told Urbanek that Blanchard complained. Id. Notwithstanding these complaints or requests for promotion, Blanchard was not promoted.

b.   Termination claim

Summary judgment must be denied as to Blanchard's claim for discriminatory termination because there is a genuine issue of material fact as to whether Blanchard was terminated and

whether that termination was discriminatory.[8]

Blanchard established a prima facie case by identifying a white comparator, Christina Trunk, who was not fired after Urbanek was informed that Trunk had shared her Blockbuster account--the same conduct for which Blanchard was terminated.  At the second step, Blockbuster produced a non-discriminatory reason for Blanchard's firing--that Blanchard voluntarily quit to go work at Eckerd.  However, third, Blanchard produced sufficient evidence that a jury could conclude that Blockbuster's asserted reason is merely a pretext or that the real motivation for Blanchard's termination is discrimination.

According to Blanchard's version of events, Blockbuster concocted an alternative story, in which Blanchard voluntarily quit, to disguise the fact that Urbanek had already fired

---

[8] Defendant points out that Blanchard's deposition testimony contradicts the written statement she made on her Eckerd application in that her application states she was employed by Blockbuster when she applied and her testimony is that she had been terminated before applying.  In some situations, conflicting evidence offered by the non-moving party at the summary judgment stage may be disregarded.  For example, an affidavit submitted by the non-moving party after the motion for summary judgment has been filed may be disregarded if it conflicts with the party's earlier deposition testimony and if the court finds that the conflict was created simply to defeat summary judgment.  Joseph v. Hess Oil, 867 F.2d 179, 183 (3d Cir. 1989).  However, here, Blanchard's deposition testimony was given on April 28, 2006, over two months before Blockbuster's motion for summary judgment was filed.  It conflicts with a written statement given by Blanchard before this lawsuit was filed.  This is not a situation in which a party has submitted new evidence at the eleventh hour solely to defeat a motion for summary judgment.

Blanchard.  In combination with Blanchard's evidence regarding
Christina Trunk, this evidence could permit the jury to conclude
that discrimination was the real motivation for Blanchard's
firing.  Because Blanchard has produced evidence which, if
believed, would allow a reasonable jury to conclude that
Blockbuster's reason for terminating her is pretextual, there is
a genuine issue of material fact and summary judgment must be
denied.

c.  Promotion claim

Summary judgment will be granted as to Blanchard's
claim of discriminatory promotion.  Blanchard has offered scant
evidence in support of this claim beyond her own belief that she
was not promoted because she was black.  See Blanchard Dep.
116:10-14, 152:12-21 (opining without support that she was denied
promotion because of her race).  Blanchard has offered no
evidence that she submitted any sort of formal application for a
promotion, that a manager position was available at her store, or
that she was qualified for a promotion.  Nor has she offered any
evidence that her race played any role in her failure to receive
a promotion.[9]

---

[9]    In fact, Love-Cash, the Blockbuster manager who was
made aware of Blanchard's desire for a promotion, is herself
African-American.  Furthermore, Garner, who also managed
Blanchard's store at some point, is African-American.  A
discrimination claim is not automatically defeated by a showing

-22-

Under these circumstances, she has failed establish a prima facie case of discrimination.  She has not shown that she was qualified for a promotion as is required to establish the second prong of the prima facie case; she has not shown that she applied for a promotion, throwing into question whether she even suffered an adverse employment action; and, she has not shown that her lack of promotion raises an inference of discrimination as is required by the fourth prong.  Therefore, summary judgment will be granted in favor of Blockbuster on Blanchard's claim for discriminatory promotion.

3.   Tyra Coleman

Coleman asserts claims for discriminatory training and termination under Title VII and § 1981.  It is undisputed that Coleman exhausted her administrative remedies.  Because the Court holds that Coleman has not established a prima facie case of discrimination as to either of her claims, summary judgment will be granted in favor of Blockbuster on both claims.

a.   Facts

Coleman was hired as a store manager trainee on September 8, 2003.  Ex. 5, Def.'s Mot. Summ. J.  On January 19,

_____

that, although plaintiff was not promoted, another member of the protected class was.  Pivirotto, 191 F.3d at 353-54.  However, this fact may go to negate an inference of discrimination.

2004, Urbanek approved Coleman's promotion to store manager at the Gray's Ferry store.  Id.

Coleman received a written warning dated April 20, 2004 from Urbanek because of a failure to meet performance standards for the store she managed.  Ex. 7, Def.'s Mot. Summ. J. Blockbuster uses a store rating system, in which the district leader inspects aspects of the store and calculates a store's numerical score.  Id.  All stores are required to maintain a score of 8 or greater.  Id.  The written warning from Urbanek states that Coleman's store was inspected on a number of occasions in early 2004.  Ex. 7, Def.'s Mot. Summ. J.  On March 3, 2004, the store received a 4.3.  Id.  On April 9, 2004, the store received a 5.  Id.  Coleman's written warning stated that the store needed to be brought to level 8 within 14 days or that, at the least, significant progress must be made.  Id.  Failure to comply would result in further disciplinary action, including, potentially, termination.  Id.

Also on April 20, 2004, Coleman received a final warning for a violation of company policy.  Blockbuster requires "cycle counts," or inventory checks, on a daily basis.  Id.  The warning states that, as of the date of the warning, there were nine missing inventory counts in the past month.  Id.  As store manager, Coleman was responsible for completing inventory counts during her own shifts and for ensuring that other employees

complied with the requirement.  Id.  The final warning stated
that "[a]ny further violation of the above detailed items
including all requirements for cycle counts will result in
termination of employment."  Id.

On June 11, 2004, Coleman received a second final
warning for violation of company policy, issued by Urbanek and
acknowledged by Coleman.  Id.  The warning describes two
violations of company policy.  First, on Monday, June 7, 2004,
Coleman failed to attend a mandatory team meeting that had been
scheduled for at least four weeks.  Id.  She did not notify
Urbanek that she would miss the meeting until the morning of June
7, 2004.  Id.  Second, on a separate occasion, Coleman brought
her two-year-old grandson to work with her for several hours.
Id.  Urbanek reprimanded Coleman and Coleman replied that she
knew she was violating company policy but that she had no choice.
Id.  The warning states that "[f]ailure to improve will result in
termination of employment."  Id.

On June 22, 2004, Coleman's employment with Blockbuster
was terminated after Coleman closed her store early.  Ex. 6,
Def.'s Mot. Summ. J.  Coleman closed the store early because she
learned that her son had been taken to the hospital.  Coleman
Dep. 303:8-15.  Before closing, Coleman called Urbanek to inform
her of the situation and tell her that Coleman needed to leave
early.  Id. 310:7-12.  Coleman testified that Urbanek's response

-25-

was: "I'm not telling you not to close the store.  I'm also not telling you not to attend to your son.  Do what you have to do. I don't know what the repercussions are going to be."  Coleman Dep. 310:13-17.  Shortly after this conversation, Urbanek called Coleman back and told her not to forget to close the cash register properly before leaving.  Id. 311:17-21.

The Separation Form signed at the time of the termination states that Coleman was terminated for closing her store early without approval from the district leader and lists Coleman's disciplinary history.  Ex. 6, Def.'s Mot. Summ. J.


b.  Termination claim

It is undisputed that Coleman can satisfy the first three prongs of the prima facie case as to her claim of discriminatory termination.  She does not satisfy the fourth prong because  Coleman has not offered evidence that she was terminated under circumstances that give rise to an inference of unlawful termination.

Coleman claims that she received permission from Urbanek to close her store early.  However, her deposition testimony, at best, establishes that Coleman and Urbanek may have had a misunderstanding as to whether Coleman had permission to

close the store.[10]  Because a jury could find that Coleman
reasonably believed from Urbanek's words that Coleman had
permission to close early, there is a genuine issue of fact as to
whether Coleman had permission.

However, this issue of fact is not material because,
even if Coleman reasonably believed she had permission and
Urbanek fired her unfairly, Coleman has not offered evidence
sufficient to raise the inference that Urbanek's actions were
motivated by Coleman's race.  It is not the role of the Court to
sit as a "super-personnel department" when reviewing an entity's
business decisions; the Court asks only whether a decision is
discriminatory.  <u>Brewer v. Quaker State Oil Refining Corp.</u>, 72

---

[10]     Arguing in the alternative, Coleman also seeks to
establish a prima facie case by pointing to a comparator who was
not fired for closing early without permission.  Coleman points
to Greg Zielenski, a white Blockbuster employee who was not fired
for closing his store early.  However, Zielenski is not similarly
situated to Coleman because it is undisputed that Zielenski had
no disciplinary history at the time he closed his store early
whereas Coleman had already received two final warnings.  Ex. 33,
Def.'s Mot. Summ. J.; Coleman Dep. 91:16-18 (testifying that she
was not aware of any prior disciplinary action taken against
Zielenski).
        Because of the progressive nature of Blockbuster's
disciplinary policy, Zielenski's lack of disciplinary record is a
material difference between him and Coleman.  The Employee
Handbook clearly states that a Class B violation, such as closing
the store early, was grounds for a final warning if it was the
first violation.  Moreover, an employee who had received a final
warning could expect that discipline for further violations would
progress to termination.  The difference between Zielenski and
Coleman's disciplinary histories explains the differing treatment
of the two and shows that Blockbuster followed its own policies.
No inference of unlawful discrimination has been raised.

F.3d 326, 332 (3d Cir. 1995) (holding court will not second-guess a non-discriminatory business decision no matter how "medieval, . . . high-handed, . . . or mistaken" it appears).  A misunderstanding or mistaken decision by Urbanek, without more, does not raise, under the circumstances of this case, an inference of discrimination.  Therefore, Coleman has failed to satisfy prong four of the <u>McDonnell-Douglas</u> prima facie case. Summary judgment for the defendant is appropriate.

c.  <u>Training</u>

Coleman's brief claims that "[l]ike other African-Americans, Coleman was denied appropriate training by Blockbuster."  Pls.' Mem. Opp. Summ. J. 20.  The only evidence cited for this claim is Coleman's own deposition testimony about Bob Baumann:

Q:   How did Bob Baumann discriminate against you?

A:   Lack of training.  Gave me the tools--did not give me the tools that I needed--or gave me the lack of tools I needed in order to perform my job well.

Coleman Dep. 273:2-5.

Coleman does not identify a non-African American comparator who received better training than she did, or offer more than a vague explanation of the deficiency in her training. <u>See</u> Pls.' Mem. 20 (claiming unspecified whites received superior training).  On the other hand, it is undisputed that Coleman

-28-

completed the twelve-week Star Maker program successfully and was promoted to store manager. Under these circumstances, Coleman has not established that she suffered an adverse employment action, nor has she established that there is a causal nexus between her race and any alleged flaws in her training. Therefore, Blockbuster's motion for summary judgment will be granted as to Coleman's Title VII and § 1981 claims for discriminatory termination.

### 4. Rasheedah Garner

Garner asserts claims for discriminatory termination under Title VII and § 1981. It is undisputed that she has failed to exhaust her administrative remedies; therefore, her Title VII claim will be dismissed. Blockbuster's motion for summary judgment will be granted as to Garner's § 1981 claim. Although Garner established a prima facie case of discrimination, she failed to produce evidence that would allow a reasonable jury to conclude that Blockbuster's legitimate reason for Garner's termination is pretextual. Based on the undisputed facts, Blockbuster is entitled to judgment as a matter of law.

### a. Facts

Garner was hired as a store manager trainee on November 3, 2003. Ex. 9, Def.'s Mot. Summ. J. She was later promoted to

store manager of the Chestnut Hill store.  Urbanek Decl. ¶ 18.
On May 10, 2004, Garner was terminated after admitting to leaving
her store unattended by a keyholder.  Ex. 10, Def.'s Mot. Summ.
J.  Garner does not dispute that she left her store unattended by
a keyholder.  Garner Dep. 57:18-20; Pls.' Mem. Opp. Summ. J. 21.
After Garner's termination, Kara Swanson, a white person, became
manager of the Chestnut Hill store.  Terry Dep. 27:20-24; Terry
Decl. ¶ 15.

        Garner testified that Bob Baumann and Scott DeWitt,
white Blockbuster employees, left stores unattended by
keyholders, but were not terminated.  Garner Dep. 49:12-17,51:17-
24, 57:12-14.  She further testified that other, unidentified
managers left their stores at various times.  Id. at 59:5-8.
Garner claims that Urbanek was aware that Baumann left a store
unattended by a keyholder because Garner told her.  Id. at 55:21-
24.  She admits that there is no indication that Blockbuster
management was aware that Scott DeWitt left a store without a
keyholder.  Id. at 61:9-20.


                b.    Termination claim

        It is undisputed that Garner suffered an adverse
employment action when she was terminated.  To establish the
fourth element of the prima facie case, Garner points out that
she was replaced by a white person, Kara Swanson.  Assuming that

                              -30-

this is sufficient to raise an inference of discrimination, the
burden then shifts to Blockbuster to produce evidence of a
legitimate reason for Garner's termination.

Blockbuster has satisfied this burden.  Garner admits
that, while working as store manager, she left the store
unattended by a keyholder, which violates Blockbuster policy.  As
evidence of Blockbuster's policy, defendant produced the
testimony of Urbanek, a Blockbuster district leader since at
least 2003, that "leaving a Blockbuster store unattended by a
keyholder is considered gross negligence that endangers people or
property and, therefore, is a Class A Gross Violation of
Blockbuster's policies and is grounds for immediate termination."
Urbanek Decl. ¶ 12.  Moreover, Blockbuster produced the
Separation Forms of five white employees who were terminated for
leaving their stores unattended by keyholders.[11]  Ex. 35, Def.'s
Mot. Summ. J.

Garner seeks to show that Blockbuster's stated reason
is merely a pretext for discrimination.  She argues, first, that
other Blockbuster employees--Baumann, DeWitt, and other
unidentified managers--also left their stores unattended by
keyholders.  However, she admitted that there is no evidence than

---

[11]    Although the race of the comparators is not evident
from the Separation Forms attached as exhibits, it was
established at oral argument that, based on other documents
produced by Blockbuster, plaintiffs are satisfied that the
proposed comparators are white.

any decision-makers at Blockbuster were aware that DeWitt left
his store.  It would not be inconsistent of Blockbuster to fire
Garner but not DeWitt if Blockbuster was aware only of Garner's
violations.

        Similarly, comparing Baumann and Garner does not
demonstrate pretext.  No evidence has been offered regarding the
position held by Bob Baumann or whether his responsibilities were
similar to Garner's.  If, like Urbanek, Baumann was a management
employment who traveled among stores, then he would presumably
not be responsible for ensuring that a particular store was
supervised at all times.[12]

        Even if Baumann and Garner held the same position,
Garner "does not create an issue of fact [regarding pretext]
merely by selectively choosing a single comparator who was
allegedly treated more favorably, while ignoring a significant
group of comparators who were treated equally to her." Simpson
v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 642 (3d
Cir. 1998).  Although such evidence may suffice at the prima
facie stage, it will not normally be enough to show pretext.  Id.
at 646.  Comparisons must be viewed in context: "the plaintiff
cannot pick out one comparator who was not [terminated] amid a

---

        [12]    Testimony from other plaintiffs in the case suggests
that Baumann may have been a training manager who did not have
responsibility for any particular store.  See, e.g., Coleman Dep.
273:2-5 (complaining of Baumann's failures in training her).

sea of persons treated the same as her to establish a jury
question." Id. Thus, in light of the termination of five
similarly-situated white comparators pointed to by Blockbuster,
Garner's selective choice of Baumann does not create a genuine
issue of fact for trial.

In addition to relying on comparators to show pretext,
Garner argues that Urbanek's stated reason must be pretextual
because Blockbuster had no policy against leaving stores
unattended by keyholders.[13] Garner points out that there was no
written policy regarding keyholders and that she herself was not
aware of any policy regarding keyholders. It is true that
Blockbuster's employee manual does not contain a written
prohibition on leaving a store unattended by a keyholder. Ex. 1,
Def.'s Mot. Summ. J. Instead, the manual prohibits "gross
negligence that endangers people or property." Id. As Urbanek
testified, leaving the store without a keyholder was considered
by Blockbuster to rise to the level of gross negligence.

---

[13] In support of this claim, Garner relies on the
declaration of Omar Marshall, which was submitted as Exhibit 4 to
the Appendix of Exhibits In Support of Plaintiffs' Opposition to
the Motion for Summary Judgment (doc. no. 145). However, this
declaration is not signed or dated and, therefore, will not be
considered for purposes of this motion. See Woloszyn v. County
of Lawrence, 396 F.3d 314, 323 (3d Cir. 2005) ("An unsworn
statement can not be construed as 'competent evidence,' and
should not be relied upon when reviewing [a motion for] summary
judgment."); Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 n. 17
(1970) (holding that an unsworn statement does not satisfy the
requirements of Fed. R. Civ. P. 56(e)).

The Court concludes that there is no genuine issue of material fact as to whether the reason given for Garner's termination was pretextual.  There are no disputed facts: Blockbuster does not contest Garner's assertion that she was not aware of a policy regarding keyholders, and it acknowledges that the manual does not contain the policy.  However, even assuming these facts to be true, a reasonable jury could not find that the keyholder policy was a pretext for Garner's termination.  To make a finding of pretext, the jury would have to identify such inconsistencies in Blockbuster's story that the given reason is unworthy of credence.  Here, the undisputed facts are that: 1) the Blockbuster manager who terminated Garner believed it violated company policy to leave a store without a keyholder; 2) numerous other employees from outside the protected class, both within and outside of Urbanek's district, were terminated for violating the keyholder policy; and 3) at least one other plaintiff has acknowledged the existence of the policy.  Garner's argument essentially boils down to the view that, if the policy were really as important as Blockbuster claims, it would have been written down or better publicized to her.  While this argument is not entirely without merit, the undisputed facts in this case make clear that, even if unwritten, the policy was applied at Blockbuster with some vigor and regardless of race. Under these circumstances, a jury could not conclude that the

reason given for Garner's termination was mere pretext.

Garner has failed to offer evidence of such inconsistencies in Blockbuster's explanation of her termination that would allow the jury to conclude that the explanation is unworthy of credence. The Court therefore turns to the second part of the <u>McDonnell-DOuglas</u> third step: whether Garner has offered evidence from which a jury could conclude that racial discrimination was more likely than not the motivating factor behind her termination. Garner cites a comment that Plaintiff Terry overheard Urbanek make to another Blockbuster employee. Terry testified that Urbanek and Jeff Stebbins of Blockbuster were conducting interviews of all the employees at the Chestnut Hill store. After Blanchard's interview, Terry heard Urbanek say "[w]e almost got them out of here" to Stebbins. Terry Dep. 83:16-84:6. Neither Terry nor Garner explain why they believe "them" referred to African-American employees. Moreover, Garner has offered no evidence that Urbanek's comment was directed to Garner in some way or connected with the decision to terminate her. Without more, the comment is insufficient to show that discrimination played a role in Garner's termination. <u>See</u> <u>Fuentes v. Perskie</u>, 32 F.3d 759, 767 (3d Cir. 1994) ("Stray remarks by decision-makers unrelated to the decision process are rarely given great weight.").

There are no genuine issues of material fact in this

case.  Although Garner was able to establish a prima facie case
of discrimination, she has not offered evidence from which a
reasonable jury could conclude that Blockbuster's legitimate
reason for terminating her was pretextual or that racial
discrimination more likely than not motivated her termination.
Therefore, Blockbuster's motion for summary judgment as to
Garner's claim of discriminatory termination will be granted.


        5.  <u>Sheila Love-Cash</u>

        Love-Cash asserts claims for discriminatory promotion
and termination under Title VII and § 1981.  It is undisputed
that she has failed to exhaust her administrative remedies;
therefore, her Title VII claims will be dismissed.  Blockbuster's
motion for summary judgment will be granted as to Love-Cash's §
1981 claims because Love-Cash has failed to establish a prima
facie case as to either claim.


        a.  <u>Facts</u>

        Love-Cash was hired to work at the Chestnut Hill store
on December 6, 2000.  Ex. 23, Def.'s Mot. Summ. J.  Love-Cash
testified that, in July 2003, after the Chestnut Hill store
manager left Blockbuster, Love-Cash was assigned to be "acting
store manager," contingent on her getting "the store to where it
needed to be," in terms of its compliance with Blockbuster

standards.  Love-Cash Dep. 52:4-5.  Although full store managers were salaried, as opposed to being paid an hourly wage, Love-Cash, as an acting store manager, was still paid on an hourly basis and received a raise of about one dollar per hour.  Id. 95:16-96:3.  Love-Cash testified that her raise was not processed for about two months after Love-Cash was made acting store manager.  Id. 30:19-24.  Love-Cash's testimony conflicts somewhat with Blockbuster records, which show Love-Cash was promoted to manager in training on September 30, 2003, not in July.  Ex. 25, Def.'s Mot. Summ. J.  Both parties agree that, prior to this promotion, Love-Cash was working as an assistant store manager.

Following Love-Cash's promotion to manager in training, she was placed in Blockbuster's Star Maker management training program.  Love-Cash Dep. 60:10-19.  The culmination of store manager training is an oral presentation given by each store manager candidate.  Love-Cash's presentation was evaluated poorly by the panel reviewing her work and she was not successful in completing store manager training.  Urbanek Decl. ¶ 37. Thereafter, Urbanek transferred Love-Cash to the Conshohocken store, the district training store, as an assistant store manager, the position Love-Cash held before she became a manager in training.  Id. ¶ 38.  Urbanek testified that the transfer was to avoid making Love-Cash report to a new store manager at Chestnut Hill after she had managed the store herself.  Id.

Moreover, working at the training store might enable Love-Cash to complete store manager training at a later date.  Id.

Love-Cash does not dispute that she never reported for work at the Conshohocken store.  Pls.' Mem. 68.  Her employment with Blockbuster was terminated on February 4, 2004.  Ex. 26, Def.'s Mem. Summ. J.  At the time of Love-Cash's termination, Urbanek was on maternity leave.  Urbanek Decl. ¶ 39.

b.  Promotion claim

Love-Cash's claim for discriminatory promotion fails because Love-Cash has failed to make out a prima facie case of discriminatory promotion.  Love-Cash has offered no evidence that she was qualified to be promoted to store manager.  Blockbuster required that all applicants for store manager positions complete the twelve-week Star Maker training program before they were eligible for promotion.  It is undisputed that Love-Cash did not successfully complete the Star Maker training program.  Because Love-Cash was not qualified for a promotion, she cannot establish the second prong of the prima facie case.

Love-Cash argues that Blockbuster's failure to promote her was discriminatory because a white male employee, Scott Miller, was made a store manager without completing the program. However, she offers only hearsay testimony that Miller had not

completed the program before his promotion.[14]  Love-Cash Dep.
56:19-57:6.  This testimony may not be considered for purposes of
this motion.[15]  <u>Philbin v. Trans Union Corp.</u>, 101 F.3d 957, 961
n.1 (3d Cir. 1996) (holding that inadmissible hearsay cannot be
relied upon to create a genuine issue of material fact).  Here,
Love-Cash admitted that she has no independent knowledge of
whether Miller completed the program nor does she have any other
information about his qualifications or his promotion.  <u>Id.</u> at
57:2-6.  Because she can point to no evidence that she was

_____

[14]    The statement relied on by Love-Cash was apparently
made to her by Miller himself.  Love-Cash Dep. 56:19-57:6.

[15]    Plaintiff argues that Miller's alleged statements to
Love-Cash and Coleman should be admitted under Federal Rule of
Evidence 801(d)(2)(D).  The rule provides that a statement by a
party-opponent is admissible if it is offered against the party
and is "a statement by the party's agent or servant concerning a
matter within the scope of the agency or employment, made during
the existence of the relationship."  Fed. R. Evid. 801(d)(2)(D).
For example, a plaintiff may testify about statements his
supervisor made to explain company employment policy even though
the plaintiff's account of the supervisor's statements would
normally be considered inadmissible hearsay.  <u>Marra v. Phila.
Hous. Auth.</u>, 497 F.3d 286, 298-99 (3d Cir. 2007).
        Courts applying the rule focus on whether the hearsay
speaker was authorized to speak with the witness about the topic
of the hearsay statement.  <u>Id.</u>; <u>Abrams v. Lightolier Inc.</u>, 50
F.3d 1204, 1215-16 (3d Cir. 1995).  A plaintiff's immediate
supervisor generally is authorized to speak with the plaintiff
about company disciplinary policies; therefore, hearsay
statements made by the supervisor about the disciplinary policies
may be admitted.  <u>Id.</u>  Here, Miller was a store manager at a
store where neither Love-Cash nor Coleman worked.  Love-Cash has
not argued that Miller was the supervisor of either herself or
Coleman and she has not shown that he was authorized to discuss
company employment policy with them.  Therefore, Miller's
statement is not admissible under Rule 801.

treated differently, Love-Cash has failed to show that the
failure to promote her occurred under circumstances giving rise
to an inference of unlawful discrimination. Therefore, she has
failed to satisfy the fourth prong of the prima facie case. See
Sarullo, 352 F.3d at 798.

Even if Love-Cash had established a prima facie case of
discriminatory promotion by relying on Miller's hearsay
statement, she would not be able to rely on the statement alone
to overcome Blockbuster's proffered reason for denying her a
promotion--her failure to complete the Star Maker program.  Love-
Cash cannot selectively choose one comparator out of the entire
company to show pretext.  Simpson, 142 F.3d at 642.  Merely
showing that one employee one time was promoted outside of normal
company methods does not show pretext.

Because Love-Cash has failed to establish a prima facie
case and has moreover failed to offer evidence sufficient to
permit a finding that Blockbuster's legitimate reason for her
termination is pretextual, summary judgment will be granted to
Blockbuster on her claim for discriminatory promotion.

c.    Termination claim

It is undisputed that Love-Cash can establish the first
two prongs of a discriminatory termination claim.  Love-Cash
admits that she was not terminated by Blockbuster; she seeks to

-40-

establish the third prong of the prima facie case by showing that she was constructively discharged.  Love-Cash argues that she was constructively discharged when Urbanek offered her the choice of transferring to either the Conshohocken or Germantown store rather than returning to the Chestnut Hill store after her unsuccessful participation in the Star Maker program.

"Constructive discharge occurs when an employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."  Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 n.4 (3d Cir. 2006).  For example, the Third Circuit has held that a transfer from one position to another constituted a constructive discharge where the new position being offered was inferior to the old position in both working conditions and compensation, where plaintiff was forced to transfer because of her sex, and where the transfer was accompanied by verbal abuse regarding plaintiff's sex and pregnancy.  Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888-89 (3d Cir. 1984).

Love-Cash argues that the transfer proposed by Urbanek was intolerable because Conshohocken is a training store, but Love-Cash was not in need of training.  Furthermore, in the opinion of one of the other plaintiffs, "Conshohocken is too far out."  Pls.' Mem. 38.  As to Germantown, Love-Cash states that there had been a shooting near the Germantown store at some point

before her transfer and that she did not feel safe at that store. Id.

This evidence would not allow a jury to conclude that Blockbuster "knowingly permitt[ed] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Spencer, 469 F.3d at 317 n.4. None of the evidence pointed to by Love-Cash shows that Blockbuster knowingly permitted conditions of discrimination in employment.[16]

Moreover, the transfer offered by Urbanek does not even approach the sort of conditions that courts have recognized to be so intolerable as to constitute a constructive discharge. See, e.g., Goss, 747 F.2d at 888-89 (finding constructive discharge based on verbal abuse, transfer to inferior position, pay cut, and hostile treatment from managers from whom plaintiff sought redress for discrimination); Levendos v. Stern Entm't, Inc., 747 F.2d 1227, 1231 (3d Cir. 1988) (holding claim of constructive discharge should proceed to trial where there was evidence that, because of her sex, plaintiff was excluded from management meetings, ignored by her superiors, denied authority that had been given to males in her position, falsely accused of stealing

---

[16]    The only so-called evidence of discrimination pointed to by Love-Cash is a delay in the processing of her raise by an unknown supervisor. When Love-Cash pressed the person about the raise, she was told that her paperwork was in a stack of paperwork that needed to be processed and that it would get done eventually. Nothing about this exchange suggests racial discrimination.

from her employer and of drinking on the job, subjected to management's comments that she was about to be fired and replaced by a male, and framed for stealing).  After the transfer, Love-Cash would have remained in the same position--assistant manager--and would have received the same compensation.  Merely requiring her to participate in training that she considered unnecessary and increasing her commute to work do not constitute conditions so intolerable that a reasonable employee subjected to them would have resigned.

Blockbuster's motion for summary judgment will be granted as to Love-Cash's claim for discriminatory termination because Love-Cash cannot show that she was constructively discharged.  Love-Cash voluntarily quit her job at Blockbuster. She suffered no adverse employment action and cannot make out a prima facie case of discriminatory termination.

6.  Eric Oliphant

Oliphant asserts claims for discriminatory training and termination under Title VII and § 1981.  It is undisputed that he failed to exhaust his administrative remedies; therefore, his claims under Title VII will be dismissed.  Summary judgment will be granted as to Oliphant's claims under § 1981 because Oliphant has failed to establish a prima facie case as to those claims.

-43-

a.  <u>Facts</u>

Oliphant was hired as an assistant store manager at the Gray's Ferry store on August 22, 2003.  Ex. 17, Def.'s Mem. Summ. J.  During a loss prevention investigation at Oliphant's store, Blockbuster learned that Oliphant had a criminal conviction that had not been disclosed on his employment application.  Urbanek Decl. ¶ 30.  Specifically, Blockbuster learned that Oliphant was convicted of fourth degree harassment, a felony, in January 2002. <u>Id.</u> ¶ 32; Ex. 19, Def.'s Mot. Summ. J.

On his employment application, when asked whether he had been convicted of a crime within the last seven years, Oliphant stated that he had "multiple misdemeanors of corr[upting] morals of minors."  Ex. 3, Def.'s Mot. Summ. J.  He did not reveal his felony conviction.  Oliphant's deposition testimony supports Blockbuster's claim that it was unaware, at the time of his hiring, of Oliphant's felony conviction. Oliphant Dep. 58:20-59:6 (testifying that he revealed his misdemeanor convictions during his application interview). Oliphant was terminated on April 30, 2004.

b.  <u>Training claim</u>

Summary judgment will be granted as to Oliphant's claim for discriminatory training because Oliphant has failed to establish a prima facie claim of discriminatory training.  To

-44-

support his claim, Oliphant offers only a vague statement that
his training was inadequate because much of it involved cleaning.
Oliphant Dep. 18-20.  Although he opines that he was kept at the
back of the training store because of his race, he offers no
concrete comparisons between himself and white employees, no
specific testimony as to tasks he was not taught to do, and no
examples of comments or actions that suggest training at
Blockbuster was conducted in a discriminatory fashion.  Id.  On
the basis of this evidence, a jury could not conclude that
Oliphant suffered an adverse employment action or that Oliphant's
race was the reason for any alleged defects in his training.
Oliphant has failed to establish the third and fourth prongs of
the McDonnell-Douglas prima facie case; therefore, Blockbuster's
motion for summary judgment must be granted.


c.    Termination claim

        Summary judgment will also be granted as to Oliphant's
claim of discriminatory termination because Oliphant has failed
to establish a prima facie case of discriminatory termination.
For purposes of this motion, it is undisputed that Oliphant is a
member of a protected category, was qualified for his position,
and suffered an adverse employment action when he was terminated.
Oliphant seeks to establish the fourth element of the prima facie
case by showing that he was terminated under circumstances giving

rise to an inference of discrimination.[17]

Oliphant does not dispute that he was a convicted felon at the time he applied for employment and that, during the application process, he disclosed to Blockbuster only that he had been convicted of certain misdemeanors.  Oliphant Dep. 58:20-6 (testifying that, during his job interview, he disclosed his misdemeanor convictions); Oliphant Employment App., Ex. 3, Def.'s Mot. Summ. J. (disclosing multiple misdemeanor convictions). However, he argues, first, that Blockbuster did not have a policy of terminating persons who falsified their employment applications, and second, that the SWAT investigation that uncovered his conviction was deployed discriminatorily.  These two facts, in his view, constitute circumstances surrounding his termination that give rise to an inference of discrimination.

As to Oliphant's claim that Blockbuster did not have a policy of terminating employees who falsified employment applications, the Blockbuster employee manual specifically provides that making false statements on an employment application is grounds for immediate termination.  Oliphant has not pointed to evidence that, in practice, Blockbuster did not enforce this policy or that Blockbuster enforced the policy in a

---

[17]    Oliphant also seeks to establish the fourth prong by relying on a comparator.  However, the evidence of a comparator on which Oliphant relies is inadmissible and this argument will therefore be disregarded.  See infra note 18.

discriminatory manner.[18]

As to Oliphant's claim regarding the discriminatory use of SWAT investigations, his brief cites no evidence to support his claim that SWAT investigations were used to target African-American employees.  Although plaintiffs criticize the SWAT investigations vociferously, no evidence has been offered to contradict Urbanek's statement that the investigations were initiated whenever a store's inventory losses reached a certain level.

Contrary to Oliphant's claim, his termination resulted from Blockbuster's routine enforcement of a written company policy.  Oliphant has not established that his termination took place under circumstances giving rise to an inference of discrimination.  He has not established the fourth prong of the prima facie case.  Therefore, Blockbuster's motion for summary judgment will be granted as to Oliphant's § 1981 claim for discriminatory termination.

7.   Mark Terry

Terry asserts claims for discriminatory termination

---

[18]    Oliphant relies on the Marshall Declaration to establish that a white employee named Hallenbach was not terminated after Blockbuster discovered he had lied on his application.  Pls.' Mem. Opp. Summ. J. 64.  However, as noted above, this unsworn, unsigned statement will not be considered for purposes of this motion.  See supra note 14.

under Title VII and § 1981.  It is undisputed that he exhausted

his administrative remedies.  Summary judgment will be granted as

to his claims because he has failed to establish a prima facie

case of discriminatory termination.


        a.  <u>Facts</u>

        Mark Terry was hired as an assistant store manager at

Blockbuster's Island Avenue store on October 20, 2003.  Ex. 11,

Def.'s Mem. Summ. J.  At some point, Terry was transferred to the

Conshohocken store so that he could complete his training.  Terry

Dep. 78:17-21.  At his deposition, Terry testified that this

transfer was directed by Urbanek.  <u>Id.</u>  She visited the Island

Avenue store and learned that Terry had not yet completed his

training; he told her that this was because the Island Avenue

store was understaffed and he was too busy working.  <u>Id.</u> 78:8-16.

She instructed him to report to the Conshohocken store, which was

a training store, for the next few weeks to complete the training

program.  <u>Id.</u> 78:17-21.  After completing training, Terry was

made an assistant manager and returned to the Island Avenue store

in that position.  <u>Id.</u> 15:11-16:7.  Finally, Terry was

transferred to the Chestnut Hill store and received a raise.  <u>Id.</u>

16:8-15.

        On July 2, 2004, Terry's employment with Blockbuster

was terminated after he left his store unattended by a keyholder.

Ex. 12, Def.'s Mot. Summ. J.  Terry does not dispute the fact
that he left the store.  Pls.' Mem. 57.  However, he testified
that he only stepped outside in front of the store to have a
snack, as he had done in the past.  Urbanek reviewed videotapes
from security cameras made on the night Terry supposedly left the
store and confirmed that he was absent from the store for 45
minutes.  Urbanek Decl. 25.  Moreover, he was not visible in
front of the store in the video.  Id.

          b.  Termination claim

      It is undisputed that Terry can establish the first
three elements of a prima facie case.  Terry seeks to establish
the fourth element, first, by pointing to comparators and,
second, by identifying other circumstances suggestive of
discrimination.[19]

---

    [19]  Terry's legal memorandum also claims that, aside from
comparisons to other employees, there are circumstances giving
rise to an inference of discrimination.  First, the memorandum
argues that it was not against store policy to leave a store
unattended by a keyholder and that Urbanek invented a new store
policy to justify terminating Terry.  Pls.' Mem. 10.  However,
this argument contradicts Terry's deposition testimony in which
he acknowledged that it was against store policy to leave a
Blockbuster store unattended by a keyholder.  Terry Dep. 40:12-
24, 41:21-42-3.
     Second, Terry cites a comment he overheard Urbanek make
to another Blockbuster employee.  Terry testified that Urbanek
and Jeff Stebbins of Blockbuster were conducting interviews of
all the employees at the Chestnut Hill store.  In between
interviews, Terry heard Urbanek say "[w]e almost got them out of
here" to Stebbins.  Terry Dep. 83:16-84:6.  Terry does not
explain why he believes "them" referred to African-American

Like Plaintiff Garner, Terry cites to Bob Baumann as an example of a similarly-situated employee who received more favorable treatment.[20]   Terry alleges that Baumann was not fired

---

employees, and does not argue that the comment was directed at himself.  He has offered no evidence that Urbanek's comment was connected with her decision to terminate him.  Therefore, the comment is insufficient to show that Blockbuster's stated reason for terminating Terry was pretextual.  See Fuentes v. Perskie, 32 F.3d 759, 767 (3d Cir. 1994) (holding "stray remarks" that are unconnected to the termination decision do not establish pretext even when made by the decision-maker who terminated plaintiff).

Third, Terry also testified that Rasheedah Garner, another plaintiff and former manager of the Chestnut Hill Blockbuster store, told him that Urbanek was "trying to get rid of [him]" and that Garner should take every opportunity to "write him up" for disciplinary violations.  Terry Dep. 45:1-5.  However, this comment suggests a personal animus against Terry, not racial bias.  Furthermore, since Terry confessed to leaving his store unattended, it cannot be inferred that Urbanek made up the violation as an excuse to terminate Terry.

[20]   Terry has, at various times, suggested several other individuals as possible comparators.  In his affidavit, he stated that a woman named Sonya had not been fired for leaving a store unattended by a keyholder.  Terry Decl. ¶ 6, Ex. 7, Pls.' Opp. Summ. J.  However, no further information about this woman has been provided.  Without any information about Sonya, such as her employment history or whether Urbanek or another Blockbuster supervisor was aware of her violation, a jury would be unable to conclude that Sonya was similarly situated to Terry.

Similarly, although Terry suggested that an employee named Scott DeWitt left his stores unattended by a keyholder, he has offered no evidence that Urbanek or anyone else was aware of DeWitt's violations.  Pls.' Opp. 21.

Finally, Terry points to Patrick Fox as a comparator.  It is undisputed, however, that Fox was terminated by Urbanek for leaving his store unattended by a keyholder.  Terry Dep. 79:13-14.  Terry argues that Fox is still a viable comparator because he left his store unattended many times before the occasion that led to his termination whereas Terry was terminated for his first offense.

This argument is unavailing.  First, Terry testified that, before his termination, he himself had left his store on a number of occasions, undermining the claim that Fox was treated

for leaving a store unattended by a keyholder even though Terry was. Although it is unclear whether Terry and Baumann held the same position at Blockbuster,[21] the Court will assume arguendo that Terry has established a prima facie case by identifying a comparator who received more favorable treatment.

Moving to the second step of McDonnell-Douglas, Blockbuster satisfied its burden of production by providing a legitimate reason for Terry's firing: his violation of company policy by leaving his store unattended by a keyholder. Terry does not dispute that he did this.[22] Moreover, although he points to Baumann as a more favorably treated comparator, Blockbuster has provided evidence that a number of white employees were terminated for leaving their stores unattended.[23]

---

differently. Second, there is no evidence that Urbanek knew of Fox's alleged violations before the incident for which Fox was terminated. Terry will be unable to show that Urbanek favored Fox by overlooking violations if he cannot show that Urbanek knew of the violations.

[21]    Baumann may have been a training manager who was not responsible for ensuring that any particular store was attended by a keyholder.  See supra note 12.

[22]    Terry argues only that it was "appropriate" that he took a break.  See Pls.' Mem. Opp. Summ. J. 57.

[23]    Plaintiffs complain that their discovery was limited to information about employees within the district managed by Urbanek while defendants now rely, at least in part, on separation forms from outside Urbanek's district to show Blockbuster's policy regarding keyholders. Pls.' Opp. Mot. Summ. J. 58.  Even if these out-of-district forms are put aside, Blockbuster has still offered evidence that it terminated any employee caught leaving a store unattended by a keyholder.  Terry

<u>See</u> Ex. 36, Def.'s Mot. Summ. J. (showing the Separation Forms of six Blockbuster employees whose employment was terminated because they left their stores unattended by keyholders).  Terry cannot rely on a single, selectively chosen comparator to demonstrate pretext.  <u>Simpson</u>, 142 F.3d at 642.

Because Terry has not pointed to evidence from which a reasonable jury could conclude that Blockbuster's legitimate non-discriminatory reason for his termination was pretextual, Blockbuster's motion for summary judgment will be granted as to Terry's claims for discriminatory termination under Title VII and § 1981.

8.  <u>Craig West</u>

West asserts claims under Title VII and § 1981 for discriminatory promotion and termination.  It is undisputed that he did not exhaust his administrative remedies.  Therefore, his Title VII claims will be dismissed.  Summary judgment will be granted as to West's § 1981 claims because West has failed to establish a prima facie case of discrimination as to either claim.

---

bears the burden of showing that Blockbuster's reason for firing him was pretextual; he has not met that burden, nor has he argued under Federal Rule of Civil Procedure 56(f) that more discovery would enable him to meet that burden.

a.    <u>Facts</u>

West was hired as a customer service representative at the Broad & Tasker store on September 4, 2001.  Ex. 21, Def.'s Mot. Summ. J.  During an April 2004 interview with Blockbuster security, West stated that he had twice observed a Blockbuster manager steal gift cards, but he refused to identify the manager.  Mem. fr. Stebbins to Urbanek, August 30, 2004, Ex. 22, Def.'s Mot. Summ. J.  In August 2004, West stated to Blockbuster security that he had seen the same manager apply fraudulent credits to a customer's account in May 2004.  <u>Id.</u>  He again refused to identify the manager.  <u>Id.</u>

West does not dispute Blockbuster's claim that he refused to cooperate in loss prevention investigations when questioned.  Pls.' Mem. 70.  During his deposition, West testified that, although he had suspicions about which employees were stealing from the store where he worked, he refused to answer questions about those suspicions.  West Dep. 97:18-23.  He testified that he believes his refusal was justified because he had only suspicions, not proof.  <u>Id.</u> at 98:1-3.

West also testified that, although he never made a formal application for a promotion, he spoke with Blockbuster supervisors about being promoted and did not receive a promotion.  <u>Id.</u> at 84:14-85:16.  Finally, he testified that he was paid less per hour than other unidentified white individuals who had been

working at Blockbuster for less time than he had.  Id. at 74-77.

On September 3, 2004, Blockbuster terminated West's employment.  Ex. 22, Def.'s Mot. Summ. J.  The Separation Form states that West was terminated for aiding and abetting theft and twice refusing to cooperate in a loss prevention investigation. Id.

b.  Promotion claim

Summary judgment will be granted in favor of Blockbuster on West's claim for discriminatory promotion.  It is undisputed that, before promoting an employee, Blockbuster required that he or she complete the Star Maker program training program.  West has offered no evidence that he qualified for a promotion by completing Blockbuster's Star Maker program or that he formally applied for a promotion.  Moreover, West has not identified any evidence showing a causal nexus between his race and Blockbuster's failure to promote him.[24]

Under these circumstances, West cannot establish that he suffered an adverse employment action or that his failure to gain promotion was related to his race.  He has not satisfied the third or fourth prong of the McDonnell-Douglas prima facie case.

---

[24]    West cites the Marshall Declaration to show that Marshall recommended West for promotion but that a white employee was promoted instead.  As stated above, this declaration may not be considered because it is unsworn.  See supra note 14.

Therefore, Blockbuster's motion for summary judgment will be granted as to West's § 1981 claim for discriminatory promotion.

###### c.    Termination claim

Summary judgment will be granted as to West's claim of discriminatory termination because West has not satisfied the fourth prong of the prima facie case by showing that he was terminated under circumstances giving rise to an inference of discrimination.  West has not offered evidence that his race played a role in the decision to terminate him.  He admits that he violated Blockbuster policy by refusing to answer questions about his suspicions of theft.  While he may believe that Blockbuster's policy of requiring employees to report even unproven suspicions is misguided, it is not for the Court to determine whether an employment decision was wrong or mistaken. Brewer, 72 F.3d at 332.  West has not pointed to a white employee who was retained after similar behavior, nor has he otherwise identified circumstances relating to his termination that give rise to an inference of unlawful termination.  Because he has not established the fourth prong of the McDonnell-Douglas prima facie case, Blockbuster's motion for summary judgment will be granted as to West's § 1981 claim for discriminatory termination.

III. CONCLUSION

For the reasons stated above, defendant's motion for summary judgment will be denied as to Plaintiff Blanchard's claim of discriminatory termination.  Defendant's motion will be granted on all remaining claims.  An appropriate order follows.